COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judges Benton and McClanahan
Argued at Alexandria, Virginia


CHARLES FRANKLIN HARLAND

MEMORANDUM OPINION[*] BY
v.        Record No. 0842-03-4           JUDGE JAMES W. BENTON, JR.
                                            SEPTEMBER 14, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Alfred D. Swersky, Judge

Heidi Meinzer, Assistant Public Defender, for appellant.

Michael T. Judge, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


The trial judge convicted Charles Franklin Harland of two counts of aggravated sexual battery of a child and one count of forcible sodomy of a child.  Harland contends the trial judge erred (1) in denying his motion to suppress statements he made to the police, (2) in ruling that the police officer's failure to record the entire interrogation did not render inadmissible Harland's statements, and (3) in finding the evidence sufficient to support the convictions.  For the reasons that follow, we affirm the convictions.

I.

The grand jury indicted Charles Franklin Harland on two counts of aggravated sexual battery of a child under the age of thirteen in violation of Code § 18.2-67.3, two counts of forcible sodomy of a child under the age of thirteen in violation of Code § 18.2-67.1, and one count of taking indecent liberties with a child under the age of fourteen, in violation of Code § 18.2-370.  On

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

an appeal which challenges the denial of a motion to suppress evidence and also the sufficiency of the evidence to support a conviction under the indictments, "'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted); Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). So viewed, the evidence proved that Harland was a friend of Kathy Wyborski's family for thirty-two years. Wyborski accepted Harland's offer to care for two of her children, a son who was eight years old and another son who was ten years old, while she was incarcerated. Wyborski was incarcerated from February of 2001 to March of 2002 and went to live with Harland in his apartment upon her release. At that time, the younger boy was still living with Harland but the older boy was living with his father and visiting occasionally.

Wyborski described an incident, which occurred prior to Mother's Day in 2002, where the younger boy came running from Harland's bedroom with Harland "right behind him." The boy ran behind her and said, "'I won't sleep with that fucking child molester.'" Five minutes later, the boy told her that Harland had sexually assaulted him. Wyborski testified that she sought help and that a complaint was reported to child protective services and a therapist within forty-eight hours of the incident.

Detective Tim Gleeson and a child protective services worker went to Harland's apartment and spoke with Wyborski about the complaint. Detective Gleeson then asked Harland if he would "voluntarily respond to the police station" for an interview regarding the complaint. Detective Gleeson testified that Harland said he would come to the police station, but "he had a couple of things to take care of first." Harland arrived at the station "within twenty minutes" after Detective Gleeson returned to the police station. In an interview room, Detective Gleeson explained to Harland that he was not under arrest, that he was free to go, and that he didn't have to talk to him if

he didn't want to. He testified that Harland responded that "it's no problem" and said he would give his side of the story.

Detective Gleeson testified he first inquired about Harland's relationship with Wyborski and learned that Harland had a long standing relationship with Wyborski's family. Detective Gleeson then informed Harland of the boy's allegations of sexual contact with Harland. He described Harland's response to his inquiry about specific sexual contact as follows:

> He told me that there had been a couple of times where [the boy] had taken his hand and placed it on his penis, and he told me about one incident that happened a couple of weeks before . . . Wyborski was released from jail. He said that [the boy] had taken his hand and put it on his penis and that, that he had moved up in the bed to the point where his groin area was by . . . Harland's head, and that he put his mouth on [the boy's] penis.

> \*     \*     \*     \*     \*     \*     \*

> He told me that [the boy's] penis was erect, and he did not recall the child ejaculating. He told me that he didn't think that he could ejaculate, but that his mouth was on [the boy's] penis for approximately 20 seconds.

> \*     \*     \*     \*     \*     \*     \*

> He told me that he thought [the boy] wanted some stimulation. He also stated that a couple of times where he had actually put his hand on [the boy's] penis, he thought the child wanted some stimulation, and that's why [the boy] had done it.

Detective Gleeson testified that he left the room briefly to speak with his supervisor after Harland made these and other admissions. When he returned to the room, he arrested Harland. Detective Gleeson informed Harland of his Miranda rights, and he had Harland initial the form from which he read the Miranda rights. After reviewing the waiver form with Harland and ascertaining that Harland understood what each right meant, Detective Gleeson began to tape record the interview. He first asked Harland if he understood his rights, and Harland responded affirmatively. Detective Gleeson then began questioning Harland, who repeated his earlier statements regarding

his sexual contact with the younger boy. Harland recalled one incident of oral sodomy, which occurred a week before Wyborski was released from jail. The other incidents occurred when Wyborski was incarcerated.

Detective Gleeson also testified as to Harland's response to questioning about any sexual contact he had with the older boy:

> [Harland] started to talk about when the [older boy] was approximately three years old. He recalled touching his penis, but when the [older boy] . . . would be in the bathtub, and he said he may have said something silly as he touched the child's penis.
>
>      *      *      *      *      *      *      *
>
> And he also talked about how there were times when [the older boy] would lie down on top of him in his bed when he would come in his room to sleep in his bed.
>
>      *      *      *      *      *      *      *
>
> He told me that --- I asked him if [the older boy's] penis was erect, and he told me he didn't think so. He did not think it was erect at that point.
>
>      *      *      *      *      *      *      *
>
> I had asked him if there were any specific incidents similar to the one with [the younger boy] where he had put his hand on [the older boy's] penis, and he told me that he does not recall. He didn't think so.

When Detective Gleeson asked if Harland thought any of his actions were wrong, Harland responded, "yes, the oral sex and the stimulation of the penis."

At trial, the younger boy testified about occasions when he slept in Harland's bed with Harland and the older boy while Wyborski was in jail. He testified Harland touched him "on [his] penis . . . underneath [his] underwear sometimes" and Harland put his mouth on his penis "more than once." He testified that one of the incidents occurred a month after his mother was released from incarceration and while she was in the apartment. He testified that he was always in Harland's

bed when Harland touched him and that sometimes his penis was "just a little way in or . . . all the way in" Harland's mouth.  He recalled that he was in third grade when Harland touched him.

The older boy testified that Harland touched him on his penis and the touching always occurred in Harland's bedroom.  He testified that Harland reached in through his underwear and that Harland twice put the boy's penis "all the way inside" Harland's mouth.  He recalled that this occurred when he was in third or second grade and that he was in fourth grade when his mother asked him if Harland had touched him.  He testified he lied to his mother and told her that Harland had not touched him "[b]ecause [he] was scared."  He said Harland stopped touching him when he was eight or nine years old.

The trial judge convicted Harland of two counts of aggravated sexual battery and of forcible sodomy.  He found the evidence insufficient to prove the charge of taking indecent liberties.

II.

Harland contends he was in custody as soon as he arrived at the police station and, therefore, the detective should have given him warnings as required by Miranda v. Arizona, 384 U.S. 436 (1966).  Harland argues that he was in custody because he was the sole suspect and, therefore, the focus of the investigation.  Denying Harland's motion to suppress, the trial judge made the following ruling:

> The defendant was not in custody in the initial portion of the interview, and as soon as he was taken into custody, he was properly Mirandized, and he knowingly, voluntarily, and intelligently waived his rights after having been Mirandized, and the statement given by the defendant was voluntary, and should not be suppressed.

In Oregon v. Mathiason, 429 U.S. 492 (1977), the Supreme Court described the circumstances under which the administering of Miranda warnings applies:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.  But police officers are

> not required to administer <u>Miranda</u> warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the person questioned is one whom the police suspect. <u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which <u>Miranda</u> by its terms was made applicable, and to which it is limited.

<u>Id.</u> at 495.

The record does not support Harland's argument that he was "in custody" when he arrived at the police station.

> Among the circumstances to be considered when making the determination of whether a suspect was "in custody" are (1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual.

<u>Harris v. Commonwealth</u>, 27 Va. App. 554, 565-66, 500 S.E.2d 257, 262 (1998).

The evidence proved that after the detective spoke with Wyborski in the apartment, he explained to Harland that he was investigating a complaint made by the younger boy and he asked Harland if he voluntarily would come to police headquarters to discuss the complaint. Harland agreed to do so, saying "he would be down shortly" but needed to do "a few things first." Although Harland was not required to do so, he arrived twenty minutes later at the station. This was a voluntary act. The record is undisputed that the detective told Harland that "he was not under arrest, and that he was free to leave . . . [and] didn't have to talk . . . if he didn't want to." The detective said he "even opened the door and told him he could leave if he wanted to." When the detective asked Harland if he could hear Harland's side of the story regarding the younger boy's complaint against him, Harland responded that he had "no problem" discussing the matter. This evidence supports the trial judge's finding that Harland initially was not in custody. "The fact that the

investigation had focused upon [Harland] and had become accusatory is not determinative of the question of custody." Smith v. Commonwealth, 219 Va. 455, 470, 248 S.E.2d 135, 144 (1978).

Harland also contends that he did not knowingly, intelligently and voluntarily waive his Miranda rights. He argues that because he had never before been arrested and did not remember signing the rights waiver form, the trial court could not find a valid waiver.

> "A defendant's waiver of his Miranda rights is valid only if the waiver is made knowingly, voluntarily and intelligently. Miranda, 384 U.S. at 475. Whether a statement is voluntary is ultimately a legal rather than factual question. See Miller v. Fenton, 474 U.S. 104, 110, 106 S. Ct. 445, 450, 88 L. Ed. 2d 405 (1985). Subsidiary factual questions, however, are entitled to a presumption of correctness. Id. at 112, 106 S. Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.' Schneckloth v. Bustamonte, 412 U.S. 218, 225[, 93 S. Ct. 2041, 36 L. Ed. 2d 854] (1973). In determining whether a defendant's will has been overborne, courts look to 'the totality of all the surrounding circumstances,' id. at 226, including the defendant's background and experience and the conduct of the police . . . ."

Burket v. Commonwealth, 248 Va. 596, 611, 450 S.E.2d 124, 132 (1994) (citations omitted).

Detective Gleeson testified that he advised Harland of his Miranda rights. After advising Harland of his Miranda rights, Detective Gleeson completed a waiver form, read the form to Harland, and allowed Harland to read the form to himself. Harland marked the form indicating that he understood each of his rights as Detective Gleeson advised him of them individually. Detective Gleeson then completed a history sheet, recording Harland's level of education, age, and employment status. Harland said he was a college graduate, he was sixty-one years old, and he was retired from a federal commission. Detective Gleeson testified that Harland agreed to speak with him and answer questions without an attorney present. Indeed, Harland indicated so by signing the waiver. This evidence establishes that Harland made a knowing, intelligent, and voluntary waiver.

Harland further contends that the trial judge erred by admitting into evidence his statements to Detective Gleeson because the entire interrogation was not recorded. He contends that the constitutional due process guarantee requires the tape recording of custodial interrogations.

Harland was in the interview room "about an hour" in the presence only of Detective Gleeson. As we have indicated, Harland was not in custody when he first spoke to the detective. After his arrest, the interrogation was tape recorded. Detective Gleeson testified that Harland agreed to make a taped statement, which lasted about 20 to 25 minutes. Detective Gleeson said that when he began recording the interview, he reviewed what had occurred prior to recording "as a matter of record."

> I said did you voluntarily respond down here to the police station, and I did advise you that you were not under arrest at first, and you did understand that, and that you are free to leave and you didn't have to tell your side of the story, and [Harland] responded yes.
>
> And then I told him did you understand that I advised you of your rights and that you understood them, and he said yes.

Harland testified that he was "[p]retty stressed out" learning he was under arrest, since he had never been arrested before, and he didn't "remember going through [the rights waiver form]." Although the record does not contain the actual recording, the record does establish that the confession Harland made after receiving Miranda warnings was fully recorded on the tape. In short, the factual predicate for Harland's contention does not exist. Accordingly, we hold that the trial judge committed no error.

### III.

Harland contends the trial judge erred in finding the evidence sufficient to support his convictions. Specifically, he argues that the dates of the alleged offenses were overly broad in counts two and three and that the Commonwealth failed to prove the act occurred as alleged in the amended count four.

Count two of the indictment alleged that the aggravated sexual battery occurred "[o]n or between the 9th day of February, 2001, and the 17th day of May, 2002." Count three alleged the aggravated sexual battery occurred "[o]n or between the 28th of August, 1995, and the 28th day of August, 2000." Count four was amended to read that the sodomy occurred "[o]n or between the 1st day of January, 1998 and the 28th day of August, 2000." We have previously held that in child sexual abuse prosecutions, "a case need not be dismissed where there is an impossibility of ascertaining the date of the offense, or where the prosecutor proves the offense occurred at a time different than that alleged in the indictment." Clinebell v. Commonwealth, 3 Va. App. 362, 366, 349 S.E.2d 676, 678-79 (1986), rev'd on other grounds, Clinebell v. Commonwealth, 235 Va. 319, 368 S.E.2d 263 (1988). Although the Supreme Court vacated the conviction in Clinebell, the Court "concluded that the indictments [in Clinebell were] legally sufficient, and on this issue, . . . affirm[ed] the holding and rationale." 235 Va. at 321, 368 S.E.2d at 264.

The following language in Marlowe v. Commonwealth, 2 Va. App. 619, 347 S.E.2d 167 (1986), is also instructive.

> [T]he complaining witnesses were two young children, ages nine and ten. To require that a child or any witness be able to recall the exact date an event occurred in his or her life in order to obtain a conviction would too often preclude prosecutions in this type of case where the victims are children and the crimes are not discovered until some time after their commission. The Commonwealth's case would too often fail because it could not specify a date of the offense against the child. It is this same reasoning which permits the Commonwealth to prove the commission of the crime charged on a date different than that alleged in the indictment.

Id. at 625-26, 347 S.E.2d at 171.

The evidence proved that Wyborski was incarcerated from February of 2001 to March of 2002. Harland confessed that he touched the younger boy's penis on at least one occasion during the period of Wyborski's incarceration. Although the younger boy could not indicate whether

- 9 -

Harland touched his penis while his mother was in jail, he did testify that Harland touched his penis when he was in the third grade. The older boy was also able to articulate that the incidents of touching and sodomy occurred when he was between second and third grade.

Code § 18.2-67.1 provides, in pertinent part, that "[a]n accused shall be guilty of forcible sodomy if he or she engages in . . . fellatio . . . and . . . [t]he complaining witness is less than thirteen years of age." Code § 18.2-67.3 provides, in pertinent part, that "[a]n accused shall be guilty of aggravated sexual battery if he or she sexually abuses the complaining witness, and . . . [t]he complaining witness is less than 13 years of age." The evidence proved that at the time of these incidents of sexual abuse and sodomy, both boys were under the age of thirteen. The age of the complaining witnesses and the proof that the acts in themselves occurred are the essence of the offenses charged. Cf. Waitt v. Commonwealth, 207 Va. 230, 235, 148 S.E.2d 805, 808 (1966) (upholding the conviction for statutory rape where the age of the child was not in dispute and time was not of the essence of the crime charged).

We hold that the trial judge did not err in denying the motion to suppress and in finding the evidence sufficient to support the convictions. Accordingly, we affirm the convictions.

Affirmed.