COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Malveaux and Senior Judge Annunziata
Argued at Alexandria, Virginia

UNPUBLISHED

DEVONTY TYRONE HALL

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1001-18-4                   JUDGE ROSEMARIE ANNUNZIATA
                                                           JULY 16, 2019
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                             James C. Clark, Judge

              Kimberly C. Stover, Assistant Public Defender, for appellant.

              Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
              Herring, Attorney General, on brief), for appellee.


        In a jury trial, Devonty Tyrone Hall (appellant) was convicted for rape and forcible

sodomy.  On appeal, appellant argues that the trial court erred in denying his motion to suppress the

evidence and in limiting his cross-examination of the victim.[1]  For the reasons that follow, we find

no reversible error, and we affirm appellant's convictions.

                             FACTS AND BACKGROUND

        On December 16, 2016, K.G., who worked as a prostitute, reported to the police that she

had been raped by appellant at knifepoint on the morning of December 15, 2016, at his

Alexandria apartment.  At about 6:00 p.m. on December 17, 2016, several police officers went to

appellant's apartment to execute a search warrant for evidence regarding the allegation.  After

knocking and announcing their presence repeatedly and receiving no response, the officers struck

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Judge Lisa B. Kemler ruled upon appellant's motion to suppress the evidence.  Judge
Clark presided at appellant's jury trial and at his sentencing hearing.

the front door of the apartment four times with a battering ram. Once the officers broke through the door, they entered with their weapons drawn and yelled, "Police, search warrant." Appellant was walking towards the front of the apartment from the back hallway. Officer Douglas Quint and Detective Ford Rhee had their guns pointed at appellant for their safety. Officer Steven Riley told appellant to put his hands behind his back and then handcuffed him. After Riley escorted appellant from the apartment, Riley told him he was being detained, and frisked him for weapons. While appellant was outside the apartment with Riley, the other officers conducted a protective sweep of the premises to ensure that no one else was present. The sweep of the apartment took about three to seven minutes. After the sweep was complete, Riley walked appellant back into the apartment and removed the handcuffs.

Rhee, who had re-holstered his weapon, spoke to appellant in the living room.[2] Rhee advised appellant that the police were investigating an allegation of rape against him. When appellant questioned Rhee about the allegation, Rhee told appellant he could come to the police station for more information. Hall stated, "Well I guess I have to come talk to you," but Detective Rhee told him, "No. That's exactly what I mean. You don't have to come talk to me." Detective Rhee told Hall that "this is a voluntary thing" and ["you don't] have to come talk to me." Hall again said, "Well I guess I have to come talk to you." Rhee told Hall again, "No, you don't have to come talk to me." When Hall told Rhee he did not have a way to the police station, Hall accepted the officer's offer to ride there in a police car. Detective Rhee told Hall "several times" that he "wasn't under arrest."

Appellant rode with Rhee to the station in the front seat of the officer's unmarked police car. He was not handcuffed or otherwise restrained. Once at police headquarters, they entered through the public entrance and appellant received a visitor's pass. Appellant and Rhee took the

---

[2] While Rhee spoke to appellant, Riley was standing about ten feet away.

elevator up to an interview room in the Criminal Investigations Section. The interview room contained a table and two chairs, and the door was unlocked. Appellant, who was not restrained, sat in a chair at the table. The interview room was the same room used for witnesses and victims; it had no physical restraints, and Hall was not restrained at any time at the station.

Rhee began a recorded interview with appellant at about 7:35 p.m. Rhee asked if appellant needed the restroom, and provided him with water and cookies. Rhee reiterated that the interview was "consensual," that appellant was not in trouble, and that appellant could end the conversation and leave whenever he wanted.

Rhee advised appellant that someone had made an allegation of rape against him. Initially, appellant maintained that he had contacted an "escort" for services on Wednesday or Thursday of that week, but that the meeting had not occurred. Appellant provided Rhee with the access code to his cell phone, which the police had seized pursuant to the warrant. Rhee said that K.G., who was an escort, had alleged that appellant raped her at knifepoint, and had provided an accurate description of both appellant and his residence. After further conversation, appellant said that he had had sex with an escort, to whom he paid a "donation" of $200 or $250. Rhee questioned appellant's story, stating that it was inconsistent with the escort's report, saying appellant was not believable, and indicating that court proceedings would not go well for him. Rhee encouraged appellant to take advantage of the opportunity to tell the truth. He explained that a polygraph test could demonstrate whether appellant was telling the truth. Appellant declined to take a polygraph at that time, and indicated he wanted to go home. Rhee said okay, and left the room briefly.

When Rhee returned, he told appellant that "before we get you out of here" he needed to execute a search warrant to obtain a DNA sample from appellant. Rhee said that as soon as the process was completed, the police would give appellant a ride home. In response to appellant's

- 3 -

question about his cell phone, Rhee said that his phone would not be returned until the investigation was complete. Rhee swabbed the interior of appellant's mouth, completed paperwork for the search warrant and the collection of the DNA evidence, and indicated that an officer was going to take appellant home.

Appellant then asked about the procedure for setting up a polygraph test and said he planned to talk to Rhee again. Rhee explained that he was going on vacation, and nothing would prevent the case from proceeding while he was away. Rhee again encouraged appellant to tell the truth, reiterating his story was not believable. Appellant then confessed he threatened the victim with a knife because he did not want to pay her the agreed "donation." Appellant admitted having sex, including anal sex, with the victim. After appellant made the incriminating statement, a police officer took appellant home.

Appellant was indicted for the rape and sodomy against K.G. Appellant filed a pretrial motion pursuant to Code § 18.2-67.7, Virginia's Rape Shield statute, to admit evidence of prior sexual conduct of K.G. Specifically, appellant argued that K.G. had a motivation to fabricate the charge because appellant had refused to pay for K.G.'s services. Appellant also contended that K.G.'s sexual conduct after appellant's alleged assault upon her, but before she reported it to the police, was relevant.

At a hearing on appellant's motion, the trial court found irrelevant the evidence regarding K.G.'s work as a prostitute before and after her encounter with appellant. Appellant asserted, however, that in the course of a sexual assault K.G claimed in 2011 the perpetrator said "this is the way it's going to go," and pulled out a firearm, employing the same language she reported to police appellant had used when he pulled out a knife and raped her. Appellant asked permission to cross-examine K.G. about the prior statement. The trial court denied the motion, ruling that

appellant had made no showing that the prior allegation was false, and further, that it was premature to rule upon the admissibility of that testimony on cross-examination.

Appellant filed a motion to suppress his statements to the police, arguing that he was subjected to custodial police interrogation without first being advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Appellant argued that, based upon the actions of the police in executing the search warrant at his apartment, he was in police custody for Miranda purposes when Rhee drove him to the police department for the interview. Alternatively, appellant argued that, even if he was not in custody when the recorded interview began, he was in police custody for Miranda purposes after Rhee executed the search warrant for DNA. In a letter opinion, the trial court found that the police did not violate appellant's Miranda rights, and denied the motion to suppress.

On direct examination at appellant's jury trial, K.G. testified that appellant responded to her advertisement for escort services, so she went to appellant's Alexandria apartment on the morning of December 15, 2016. K.G. asked appellant for money in return for her time. K.G. saw a knife in appellant's hand, and testified that he said, "This is how it's going to go." Appellant then had sexual intercourse with K.G. against her will, and he sodomized her as well.

During cross-examination of K.G., appellant sought to ask her about the prior complaint of sexual assault she made in 2011.[3] He argued that K.G. alleged her attacker in 2011 had also said "this is the way it's going to go," then pulled out a gun. Appellant further contended that cross-examination of K.G. on the prior statement was not "a rape shield issue" and that the information was relevant to K.G.'s credibility and to whether she was "conflating" the two incidents. The trial court excluded the evidence, finding the potential for prejudice outweighed

---

[3] Appellant argued that the evidence could be "sanitized" by omitting any reference to the incident as having been a sexual assault.

its probative value and there was "no real showing . . . that what she said before was false," as required by Virginia's Rape Shield statute.

## ANALYSIS

### I.

Appellant argues that the trial court erred in denying his motion to suppress because the police obtained his statements in violation of his constitutional rights.  In considering this question, "we view the evidence in the light most favorable to the Commonwealth, the party prevailing below."  Aldridge v. Commonwealth, 44 Va. App. 618, 638 (2004).  Moreover, "the burden is upon [the appellant] to show that the ruling [upon the motion to suppress] . . . constituted reversible error."  Id. (quoting McGee v. Commonwealth, 25 Va. App. 193, 197 (1997) (*en banc*)).

"Where an accused in a criminal case is subjected to custodial police interrogation, he first must be advised of his Fifth Amendment rights as defined in Miranda . . . for any statement he makes to be admissible in evidence."  Commonwealth v. Thornton, 24 Va. App. 478, 488 (1997).  Statements obtained during custodial interrogation without Miranda warnings "generally will be subject to exclusion for most proof purposes in a criminal trial."  Anderson v. Commonwealth, 279 Va. 85, 90-91 (2010) (quoting Dixon v. Commonwealth, 270 Va. 34, 39 (2005)).

"However, 'police officers are not required to administer Miranda warnings to everyone whom they question,' and Miranda warnings are not required when the interviewee's freedom has not been so restricted as to render him or her 'in custody.'"  Harris v. Commonwealth, 27 Va. App. 554, 564 (1998) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  "Whether a suspect is 'in custody' under Miranda is determined by the circumstances of each case, and 'the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement"

of the degree associated with formal arrest.'" Ford v. Commonwealth, 28 Va. App. 249, 256 (1998) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Evaluating whether a detention is "custodial" under Miranda requires consideration of many factors, including

> whether a suspect is questioned in familiar or neutral surroundings, the number of police officers present, the degree of physical restraint, and the duration and character of the interrogation. Whether or when probable cause to arrest exists and when the suspect becomes the focus of the investigation are relevant factors to consider. "[T]he language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, and the duration of the detention and the degree of pressure applied to detain the individual" may be significant factors as well.

> However, no single factor alone may necessarily establish custody for Miranda purposes, and not all factors may be relevant in a given case.

Wass v. Commonwealth, 5 Va. App. 27, 32-33 (1987) (citations omitted). "It is the custodial nature *rather than the location of the interrogation* that triggers the necessity for giving Miranda warnings." Aldridge, 44 Va. App. at 643 (quoting Coleman v. Commonwealth, 226 Va. 31, 47 (1983)). "Brief, complete deprivations of a suspect's liberty, including handcuffing" do not constitute an arrest if the restraint is reasonable under the circumstances. Thomas v. Commonwealth, 16 Va. App. 851, 857 (1993). In addition, "the release of the interviewee at the end of the questioning" is a relevant consideration in determining whether a person is in custody for purposes of Miranda. Howes v. Fields, 565 U.S. 499, 509 (2012).

While there was an initial show of force when the police arrived to search appellant's apartment, and appellant was handcuffed while the officers performed a protective sweep of the premises, the police then released him, readmitted him to the apartment, and assured him that he was not under arrest. When the show of force dissipated, with weapons stored, Rhee asked whether appellant would come to the police station to discuss the matter, making clear that appellant was free to refuse, and was under no obligation to speak to him. Appellant voluntarily

- 7 -

agreed to Rhee's request, accepted the offer of transportation to the police station, and spoke to the detective in the interview room. Thus, as the trial court concluded, a reasonable person would not have believed that he was being kept in the interview against his will, and appellant was not in custody for purposes of Miranda when the questioning began at police headquarters. See Dixon, 270 Va. at 40 ("[W]hether a suspect is 'in custody' requires an objective focus, [and] the only relevant inquiry is how a reasonable person in the suspect's situation would have understood his circumstances.").

After making statements to Rhee, appellant stated that he wished to leave. Rhee honored appellant's request, ended the interview, and left the room to arrange transportation for appellant. When he returned, Rhee executed the search warrant for DNA evidence and, after Rhee obtained the sample, the conversation with appellant resumed. Appellant argues that, with the execution of the search warrant, he was in custody for Miranda purposes and any statement he made thereafter was inadmissible. We disagree.

There is no evidence of any restraint imposed by the police preventing appellant from leaving the interview room. While the warrant for a DNA sample and Rhee's prior questioning made appellant aware that he was the subject of an investigation, his freedom was never restricted to the degree associated with a formal arrest. Rhee did not prevent appellant from leaving, either before or after obtaining the DNA sample, and the tenor of the encounter remained conversational. Appellant asked the detective about the procedure to arrange a polygraph test. Rhee simply responded to appellant's questions about the detective's availability for further discussion and how the matter could progress in Rhee's absence. It was appellant's decision to make incriminating statements at that juncture. Thus, the totality of the circumstances regarding appellant's freedom of movement was unchanged, and a reasonable person in appellant's situation would have believed he was free to leave, which appellant

ultimately did.  Accordingly, the trial court did not err in denying appellant's motion to suppress his statements.

II.

Appellant argues that the trial court erred in limiting his cross-examination of K.G. and precluding him from asking about a statement she made regarding a prior charge of sexual assault in 2011.  The trial court found that the proposed cross-examination violated the Virginia Rape Shield statute and that it would elicit a matter more prejudicial than probative.  Appellant challenges these rulings on appeal, and argues that the exclusion of evidence violated his constitutional rights.

In sexual misconduct cases in Virginia, "general reputation or opinion evidence of the complaining witness's unchaste character or prior sexual conduct shall not be admitted" under Virginia's Rape Shield law, Code § 18.2-67.7(A).  Further, "evidence of specific instances of [the complaining witness'] prior sexual conduct" generally is inadmissible.  Id.  "Prior sexual conduct" is defined as "any sexual conduct on the part of the complaining witness which took place before the conclusion of the trial, excluding the conduct involved in the offense alleged under this article."  Code § 18.2-67.10(5).  Despite the general prohibitions, "a complaining witness in a sexual assault case may be cross-examined about prior false accusations of sexual misconduct."  Va. R. Evid. 2:608(e).

Appellant argues that he did not seek to cross-examine K.G. about an allegation of sexual conduct, but instead sought to demonstrate that K.G. was not a credible witness because she had twice alleged that an attacker said the same thing to her in the course of committing the offense.  Thus, he argues, the evidence was not about sexual conduct, and was not subject to the limitations of the rape shield statute.  See Clinebell v. Commonwealth, 235 Va. 319, 323 (1988) (victim's prior false statements concerning sexual behavior, as evidence for impeachment, were

- 9 -

not 'conduct' within the meaning of Code § 18.2-67.7); <u>Evans v. Commonwealth</u>, 14 Va. App.

118, 123 (1992) (where relevant evidence is not of prior sexual "conduct," Code § 18.2-67.7

does not apply).

Appellant maintains that this issue is controlled by <u>Brown v. Commonwealth</u>, 29

Va. App. 199, 216 (1999), which held that the trial court in a sexual assault case erred by

refusing to allow evidence of prior testimony by the complainant in an unrelated rape

prosecution "when [it was] offered to show its substantial similarity for the purpose of testing the

credibility of the witness . . . ." In <u>Brown</u>, the defendant "sought to question [the complaining

witness] about her prior testimony, not her prior conduct . . . [,]" and the evidence did not fall

within the scope of Code § 18.2-67.7. <u>Id.</u> This Court stated:

> [The victim's] testimony in this case bore many striking
> similarities to her earlier testimony in [the prior rape prosecution].
> In both cases, [she] claimed that she did not know her attacker
> prior to the day of each incident. In both cases, [she] drove each
> man around in her own automobile and admittedly spent time
> talking with each. She also testified that she voluntarily consumed
> alcoholic beverages and socialized with each man prior to the
> alleged attacks. In each case, [the victim] stated that she requested
> and was permitted to go to the bathroom after each man had started
> to molest her. Such substantial similarities may suggest
> fabrication.

<u>Id.</u> at 215-16.

In this case, the testimony appellant sought to elicit on cross-examination concerned

K.G.'s prior statement about the 2011 attack, not about her conduct. In both the prior attack and

her encounter with appellant, the assailant used the same phrase, "this is the way it's going to

go." Under these circumstances, Code § 18.2-67.7 did not require exclusion of the testimony,

and the trial court erred in limiting appellant's cross-examination of K.G. on the rape shield law

ground.

"Because '[c]ross-examination is an absolute right guaranteed to a defendant by the confrontation clause of the Sixth Amendment and is fundamental to the truth-finding process,' any error in improperly restricting cross-examination is an error of constitutional magnitude[,]" and we must determine whether any error was harmless. Clifford v. Commonwealth, 48 Va. App. 499, 511 (2006) (quoting Clinebell, 235 Va. at 325), rev'd on other grounds, 274 Va. 23 (2007). "When a federal constitutional error is involved, a reversal is required unless the reviewing court determines that the error is harmless beyond a reasonable doubt. The reviewing court must determine 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Pitt v. Commonwealth, 260 Va. 692, 695 (2000) (quoting Chapman v. California, 386 U.S. 18, 23 (1967)).

As to both the rape and sodomy offenses, we can determine beyond a reasonable doubt that there is no reasonable probability that the exclusion of the testimony contributed to appellant's convictions. That K.G.'s assailant in 2011 made the same statement that appellant made before he attacked her was of marginal probative value when weighed against the overwhelming evidence against appellant. Although the victim went to appellant's apartment to have sex with him, she testified that he raped and sodomized her at knifepoint against her will. Appellant forced himself upon her when she asked for the agreed-upon "donation." The day after the incident the victim called the police, reported what had happened, and provided appellant's address. The victim accurately described appellant and his apartment. In his statement to the police, appellant admitted that he had had sex with the victim at knifepoint because he did not want to pay her the "donation," using the victim's particular word for payment as related in her story to the police. Thus, in light of such overwhelming evidence, we cannot reasonably conclude that the exclusion of K.G.'s testimony in regard to a prior claim might have contributed to appellant's conviction. See Schmuhl v. Commonwealth, 69 Va. App.

281, 313 (2018). Moreover, any possible error did not affect the sentencing verdict, as the jury recommended sentences of five years for each conviction, the minimum permitted by statute. See Code §§ 18.2-61(B) and 18.2-67.1(B). Therefore, we conclude that any error by the trial court was harmless beyond a reasonable doubt.

CONCLUSION

For the foregoing reasons, we conclude that the trial court did not err in denying appellant's motion to suppress, and did not commit reversible error in limiting appellant's cross-examination of K.G. Accordingly, we affirm appellant's convictions.

Affirmed.